RECIII/2005R01374

RECEIVED-CLERK
U.S. DISTRICT COURT
2006 MAR -1 P 2 14

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| v. | : | Crim. No. 06-243 |
| MYRIAM VACA | : | 18 U.S.C. § 371 |

UNITED STATES DISTRICT COURT
2006 MAR 29 P 4: 59
RECEIVED
WILLIAM T. WALSH, CLERK

INFORMATION

The defendant **MYRIAM VACA**, having waived in open court prosecution by Indictment, the United States Attorney for the District of New Jersey charges that:

**(Conspiracy to submit false statements to FHA)**

**FHA-insured loans**

1. At all times relevant to this Information:

(a) The Federal Housing Administration (the "FHA") was a division of the United States Department of Housing and Urban Development ("HUD"). Generally, the FHA administered a mortgage loan insurance program to assist low and moderate income borrowers by lowering the costs of mortgage loans they obtained to purchase or refinance their homes and by encouraging lenders to make mortgage loans to borrowers who might not have been able to meet conventional loan underwriting requirements. The insurance program protected lenders against loan defaults, and was funded by premium payments from borrowers. Compared to conventional loans, FHA-insured mortgage loans usually had lower down payments, a limitation in mortgage company fees, and the

capacity to include closing costs into the loan amount.

(b) In order to facilitate the making of FHA-insured mortgage loans, certain mortgage companies were authorized to act as agents for HUD and the FHA by themselves reviewing and qualifying loans for FHA insurance. To be an agent for HUD and the FHA, a mortgage company had to meet several criteria, including demonstrating at least five years of experience in the origination of single family mortgages; employing a mortgage underwriter registered with HUD; using approved appraisers; and implementing a written quality control plan assuring compliance with HUD's regulations. Such a mortgage company was also required to submit a small number of their loans to HUD as test cases for close review. If those loans were satisfactory and other program criteria were met, then the company would be authorized to qualify loans for FHA insurance.

(c) The authorized mortgage company was then responsible for determining that a proposed mortgage loan was eligible for insurance. The authorized mortgage company was required to evaluate the borrower's income and available assets and to evaluate an appraisal of the property. It would then approve the loan for FHA insurance and disburse the loan monies at a closing.

(d) Typically within sixty days following the loan closing, the authorized company was required to send a mortgage loan package for insurance endorsement to a HUD Home

Ownership Center. The package generally included the loan application; an application for insurance of a mortgage; verifications of employment and down payment deposit or, in the alternative, documents such as Forms W-2 and pay stubs; documents attesting to friends or relatives who provided the borrower with gifts of money to be applied toward the purchase of the home, which were sometimes referred to as "gift letters;" a property appraisal; copies of the mortgage and note; and a certification from the underwriter that HUD's underwriting criteria had been satisfied.

(e) Following receipt of the mortgage loan package and a review by HUD of the data in the package, the FHA would endorse the loan for insurance by issuing a mortgage insurance certificate. The mortgage loans were generally sold to financial institutions, sometimes called "investors," which relied on the accuracy and genuineness of the underlying loan transaction documents.

(f) The FHA mortgage insurance certificate would be issued to the lender which originated that loan. If the loan was sold, it was the responsibility of the originating lender to forward the insurance certificate to the lender or institution which purchased the loan.

(g) If the borrower defaulted on the FHA-insured mortgage loan, the lending institution holding the note was required to make reasonable attempts to collect the outstanding

mortgage payments. If these attempts failed, the lending institution would begin foreclosure proceedings on the subject property, and then file a claim with the FHA and assign the property to FHA. The FHA would then reimburse the lending institution for the unpaid mortgage amount. Additionally, the FHA would be responsible to pay the holding costs associated with the property, such as property taxes, preservation and protection fees, and attorney's fees, until the FHA could resell the property.

**The defendant**

2. Defendant **MYRIAM VACA** was an employee of multiple businesses including a check cashing business located at 309 Morris Ave., Elizabeth, New Jersey. Between in or about 1999 through in or about 2001, defendant **MYRIAM VACA** assisted borrowers in qualifying for FHA insured mortgages.

**THE CONSPIRACY**

3. From in or about December 1999, through in or about July 2001, in Union County, in the District of New Jersey and elsewhere, defendant,

**MYRIAM VACA**

did knowingly and willfully conspire and agree with others to make and cause to be made materially false, fictitious, and fraudulent statements and representations in matters within the jurisdiction of the executive branch of the United States, namely HUD, in the form of falsified loan applications and supporting

documents which were submitted to the FHA, and which related to loans insured by the FHA, contrary to Title 18, United States Code, Section 1001.

OBJECT OF THE CONSPIRACY

4. It was the principal object of the conspiracy to fraudulently induce the FHA, to insure certain mortgage loans made by an authorized mortgage company, enabling defendant **MYRIAM VACA** and her co-conspirators to earn profits from the sales of properties financed by such loans.

MEANS AND METHODS OF THE CONSPIRACY

5. During the above period, defendant **MYRIAM VACA** and her co-conspirators submitted falsified mortgage loan applications and related documents concerning properties on which one of her co-conspirators was the realtor. The mortgage loan applications and related documents were falsified by defendant **VACA** in several ways, including the following:

(a) defendant **MYRIAM VACA** provided and caused to be provided funds which the borrowers produced at closing, while borrowers falsely represented that those funds were "gifts" from friends or relatives, through the creation of false "gift letters"; and,

(b) defendant **MYRIAM VACA** disguised the transfer of the illicit proceeds of the fraud by using her personal bank account to deposit attorney trust account checks made payable to other co-conspirators. She then returned the funds to her co-

conspirators using her personal bank account.

**OVERT ACTS**

6. In furtherance of the conspiracy and to effect the object thereof, defendant **MYRIAM VACA** and other co-conspirators committed the following acts in the District of New Jersey and elsewhere:

(a) On or about December 17, 1999, defendant **MYRIAM VACA** caused to be submitted to the FHA a falsified loan application in connection with a property located at 450 E. Jersey Street, Elizabeth, New Jersey, on which an FHA-insured mortgage loan of $165,000 was subsequently approved.

(b) On or about June 8, 2000, defendant **MYRIAM VACA** caused to be submitted to the FHA a falsified loan application in connection with a property located at 1088 Magnolia Ave, Elizabeth, New Jersey, on which an FHA insured mortgage loan of $154,000 was subsequently approved.

In violation of Title 18, United States Code, Section 371.

Christopher J. Christie
CHRISTOPHER J. CHRISTIE
United States Attorney

CASE NUMBER: 06-__________

**United States District Court**
**District of New Jersey**

**UNITED STATES OF AMERICA**

**v.**

**MYRIAM VACA**

# INFORMATION FOR

18 U.S.C. § 371

**CHRISTOPHER J. CHRISTIE**
*U.S. ATTORNEY NEWARK, NEW JERSEY*

**Richard E. Constable, III**
*ASSISTANT U.S. ATTORNEY*
*NEWARK, NEW JERSEY*
*973-645-2719*